Next case on the calendar is Pareda v. Del Papa Good morning. My name is John Lambrose. I'm here on behalf of my client Mr. Pareda, the appellant. And if the court pleases, I'd like to reserve a couple of minutes in rebuttal if necessary. The only question that's been certified for this court and briefed in the principal briefs is the ineffective assistance of counsel claim. The three other issues have not been certified, but I did brief them in both my opening brief and in my reply brief. And to the extent that the court may have any questions regarding those issues, I'd be pleased to respond to those questions. Ineffective assistance of counsel claim, of course, begins with what standard of review the claim is subject to. And under the AEDPA, or the Ineffective Death Penalty Act, the standard of review is certainly deferential to what the Nevada Supreme Court decided back in the year 2000 when it reviewed the ineffective assistance of counsel claim. The question then becomes really what layer of review does this court, sitting as a federal court, impose upon the Nevada Supreme Court's decision. And in our briefs, we took the position that subsection 2, I believe, of 2254D applies, and that is that the Nevada Supreme Court's decision was an unreasonable application of the facts that were presented in light of the controlling law. It found that there was no prejudice, right? Yes. Well, the Nevada Supreme Court found actually that they, and this was something I was going to get at down the road a bit, but essentially they found that there was no prejudice, but the reason that our position is that that finding is not entitled to any deference is that they seized upon what I would consider a, or what I would characterize as a red herring presented by the State of Nevada at the evidentiary hearing in the post-conviction proceeding. And that red herring was Mr. Parada didn't present any alibi witnesses or any proof that there was, that he indeed had an alibi. That was a red herring because that was not the gravamen of the ineffective assistance of counsel claim. The gravamen of that claim was that Mr. Parada's lawyer did nothing to prepare for trial. If there was nobody to interview who would have been of benefit, isn't that a no prejudice decision? But, see, that's the easy answer and the easy way out that the Nevada Supreme Court took. And there's nobody there to interview. There were several people to interview. There was Marissa Katz, the 14-year-old girl who said that she saw the two black men and the white man arguing in the parking lot and then six minutes later heard the gunshots, which was in complete contravention to Mr. Rabattin, the victim's testimony at the preliminary hearing. Mr. Rabattin said that as soon as he left the bar and walked into the parking lot, he was immediately accosted by the men and shot. That's completely contrary to Marissa Katz. Did she testify? She testified. He didn't interview her. She testified at the prelude. He didn't interview her between the preliminary hearing and the trial. Did she also testify to what you just said? Yes, she did. What would he have found out if he had interviewed her? Here's why I think, and you've got to kind of understand what happened in this case and why I think the prejudice is more compelling than it looks like if you just take a superficial look at it. The prosecution on the eve of trial was not real confident with regard to the quality of their case and whether or not they were going to be able to prove what it is they had pled in the indictment. How do you know that? Well, because they said so, because it came out at sentencing. At sentencing of Mr. And that can be found at, make sure I have my excerpt site correct here. The sentencing hearing, I believe, is at 803 and 804, pages 803 of our excerpts. What happened was it came out that the State of Nevada had offered Mr. Pareda a deal to plead guilty to conspiracy with a six-year cap. And the reason that that offer had been made, and the district attorney corroborated this at sentencing, was because of his perceived weakness of his case after Mr. Rabotin had died in an unrelated automobile accident. That made the case weak just by itself, right? Exactly. And the court has Rabotin's preliminary hearing transcript. His preliminary hearing transcript was not all that compelling. He picked out the wrong guy in a physical identification lineup. He testified at the preliminary hearing, he testified, well, you know, I guess what I'm remembering is the clothing and not really the two defendants that are present in court. So, obviously, the district attorney, number one, was very concerned about the fact that his case had become much weaker because of the untimely death of Rabotin. And you can tell that the district attorney had also failed to really prepare his case, because it was not until the eve of trial that he even realized that there was another bartender, Ms. Seifert, I believe, that could come in and testify and corroborate Janice Wheeler, the other bartender, that Parada had indeed been in the bar that evening. And the reason that that's important is because Wheeler and Seifert did not testify at the preliminary hearing. But Wolfbrandt, Mr. Parada's lawyer, knew that because he had the police reports. He knew that Wheeler and Seifert had all been interviewed. He knew that Wheeler was going to be a witness because she was listed on the information. And then they battled on the eve of trial as to whether or not Seifert should be allowed to testify. The trial court waffled a bit on that and ultimately allowed her to testify. But Wolfbrandt, trial counsel, the alleged ineffectual assistance trial counsel, said, well, I'm going to need a little more time to get ready. And even then didn't interview Seifert or Wheeler. And he admitted this at his post-conviction hearing. He said, you know, I would That testimony inculpated your client? Yes. It inculpated him because, and again, these are out of the mouth of Mr. Wolfbrandt, the alleged ineffective assistance of counsel attorney. He says that, you know, I probably should have interviewed them because the theory of my defense was going to be that Parada and Dominguez were out doing a drug deal or Parada was just outside doing drugs and that this was That's kind of a tough defense to put up, isn't it? My client wasn't inside, but he was outside dealing drugs. Well, it sure is a tough defense if you hadn't gone and interviewed the two witnesses that were going to say the exact opposite. And, you know, in his excuse, I mean, if you look at, I mean, to me, this is a dead-bang cinch that this was deficient performance. So the first prong of Strickland is satisfied because, quite frankly, this is pretty close to chronic. This is pretty close to no defense whatsoever because, by his own admission, Wolfbrandt says at the post-conviction hearing, yeah, you know, I went to the bar, but I didn't want to talk to these people because it was kind of emotional and, well, he could have at least, if he had that, you know, first of all, a criminal defense lawyer shouldn't be practicing criminal defense if they don't want to talk to witnesses that have direct evidence as to his client's complicity in a crime. But, you know, if he is squeamish, then he could hire a surrogate as an investigator that could go in and say, yeah, well, you know, I talked to, here's what I found out, A, B, and C. And this is what they're going to say. So if Wolfbrandt had had that information, you know, who knows? Maybe Mr. Pareto would have taken the deal and fled guilty to the six-year sentence. You're just speculating on what he would have found if he had interviewed these people because they testified and co-paid your client, right? Well, I don't think it's a speculation, Judge Steiler, in that it was either Wheeler or Seifert, and I have it in my briefs, I think it was Wheeler who said, you know, nobody ever asked me about it, including the district attorney. And, again, Wheeler and Seifert, the bartender and the back bar woman, never testified at the prelim. So here they are, you know, basically they're being asked these questions on the eve of trial by both the state and defense counsel. And here's what I think happened. What I think happened was as soon as Rabotin was killed in the automobile accident, the district attorney was going, oh, my God, got his investigators out there and found, you know, started to learn his case. And once he learned his case, he thought, well, maybe I'd better offer these guys a deal. As you may recall from the evidence, the trial evidence, Dominguez was also offered a deal. Dominguez was ready to plead guilty, started pleading guilty. The judge, the trial judge, didn't take the plea because Dominguez refused to implicate Pareda, refused to provide evidence against Pareda. So that plea went south, right in the middle of trial. As I understand your position here is you say a person has a right to writ if he can show that his counsel failed to interview somebody who testified against his client. That's what you're saying here. That's part of what I said. Yeah, that's all you're saying. Yes. You don't know what he could have found out that would have impeached that person or contradicted that person. Right. Well, you're just saying per se failed to interview somebody. No, no. Even I can't stand up and say that. Because I think what happens is that is an absolute prerequisite to any legitimate Sixth Amendment defense in a criminal case. Go interview each and every witness that's listed. If you fail to interview one, that's a writ, right? That's what you're saying. Well, if you fail to interview a witness that's providing direct evidence as to each and every count in the indictment and each and every element in those counts, yeah, then I think you've got a problem if there's prejudice, obviously. I mean, the law is the law. I can't rewrite Strickland. I'm not saying that this is error per se. It's darn close. You have to show prejudice. I have to show prejudice. And our position, and, you know, I don't want to just keep going over what it is we've argued in the briefs. But, you know, I mean, the prejudice, I'm certain the prejudice that the prosecution was worried about was an effective cross-examination of the two bartenders, the ladies that were in the bar, an effective cross-examination of Marissa Katz, and a lawyer that would get up there and say, okay, we don't have Gregory Rabotin, ladies and gentlemen of the jury, while he's cross-examining Marissa Katz, the 14-year-old, but we have his preliminary hearing transcript, and you just heard that read into the record. I wasn't there, but Mr. Parada's previous attorney was there and cross-examined Mr. Rabotin. And here's what Mr. Rabotin said. Ms. Cotts, Mr. Rabotin picked out another person from this lineup and didn't pick out the person that you said was talking to Mr. Rabotin. Can you offer the jury any explanation as to why it is that you picked this person out and Mr. Rabotin did not? That kind of cross-examination never happened. It never happened because Mr. Wolfbrandt was basically flying blind. We're talking about a man, a defense lawyer, who was going into a trial where his client was exposed to nearly 50 years of time and got 45 and thought that his defense was going to be something that didn't happen. And have you put in the record what those witnesses would have said if they had been asked by the defense counsel? No, that was never made a part of the state record. We know then. That goes back to my issue of speculation. Well, I think that we're a federal appellate sitting in review under both AEDPA and the prejudice prong of Strickland. And as I believe it's Avila v. Galazza, 297, Fed 3rd, 911 at note 7, says that a Brecht harmless error analysis is not necessary because Strickland's prejudice analysis is meaningful enough under the Constitution. I think a federal court has to speculate a little bit. I mean, there's no way that you can conduct a prejudice analysis without some speculation. And I think what I just portrayed, the little vignette that I gave the court with regard to how defense counsel could have cross-examined the 14-year-old and could have cross-examined the two bartenders and could have cross-examined Mr. Contreras, who was taking out the trash and saw the fight, all of those witnesses really could have and should have been cross-examined by what the victim told the justice of the piece at the preliminary hearing, which was closer in time to the event and more compelling since he was indeed the victim. He saw these two alleged perpetrators point blank. And there were discrepancies between what he saw and certainly between what the little 14-year-old girl saw. And that kind of cross-examination never occurred. And it never occurred because Mr. Wolfbrand, defense counsel, never took the time. And it's really just inexplicable to me how you could go down to the bar and not talk to the people. What's the point? Their ineffective assistance is failure to talk to the witnesses in advance. It's the impact that that failure had on his right to a fair trial, not just the failure. The failure goes to deficient performance. The impact that that failure had is what I've been trying to impart is the prejudice prong. I mean, obviously I can't stand up here and say I win just because Mr. Wolfbrand didn't interview witnesses. I have to prove that that failure to interview witnesses impacted the, you know, had a, it was reasonably probable that the outcome would have been different. It undermines this court's confidence in the outcome. Defense counsel in a given case is not required to cross-examine a given witness, right? I'm sorry? A defense counsel is not required to cross-examine a given witness in a case, in a criminal case. I'm sure you've had plenty of them like that, right? Absolutely. And I'm doing appellate work since I didn't have a lot of success in the trial level. So I'm not saying that I was a great cross-examiner myself. But that decision is mitigated or that decision, I guess, is somewhat subject to whether or not the decision made any sense. I mean, the Sanders v. Rattell case, an older case from this court, 21-Fed 3rd, 1446. Deficient performance is satisfied when an attorney does not investigate and does not have sufficient reasons to justify that failure. Well, I think that that statement of the law, that derivative principle from Strickland, certainly applies to a decision not to cross-examine. I mean, you just can't sit there as a lump or as a potted plant, as they said during Iran-Contra, if the decision to not cross-examine is based on the fact that, oops, I didn't prepare. I mean, that's not a – that's a clear violation of the Sixth Amendment. But if the decision not to cross-examine is predicated on I got just what I wanted at a direct, I'm not going to mess it up by doing some cross-examination here, that's effective counsel. That's not what happened here by Mr. Wolfbrand's own admission in the post-conviction hearing. He, like I said, you know, and I don't want to beat a dead horse, but he kept saying I'm going in there thinking I'm going to do a defense that's based on my client was merely present, not that there was an alibi, again, the red herring that the Nevada Supreme Court seized upon, which is why their opinion is not really entitled to any deference, but that he was going to, you know, that he was doing a drug deal. He finds out for the first time during the direct examination of the two bartenders and Mr. Contreras and the coin man, Mr. Walter, that they were indeed inside the bar. So, you know, it's like where have you been here, you know? If you had just asked a few questions, perhaps Mr. Parada's uncounseled decision to go to trial would have been different. I mean, to me that's an outcome determinative fact that this Court can take into consideration. You know, Parada just makes a decision to go to trial based on what his lawyer has done investigation-wise, and that was nothing, nothing. Unless the Court has any other questions, I can reserve my remaining time. State. May it please the Court. I'm Deputy Attorney General John Warwick. I'm a respondent of Pele's in this matter. This is a case that is controlled by Strickland. It's an effective assistance of counsel case. That's the sole question that was certified to the Court. Mr. Lambros, at the beginning of his argument, stated that counsel did nothing to prepare for trial, and he states the same thing at page 31 of the opening brief. The State's position is that under the two prongs of Strickland, counsel's actions were reasonable. He did conduct an investigation. By going to a crime scene with his co-counsel, he did conduct an investigation. Well, that's fairly minimal if he's not talking to witnesses, though. Well, it went to some of what he used in his closing argument and some of his questioning of the officers. The officer, I think. That certainly is an answer to an argument that counsel did absolutely nothing, but it's not much of a response to counsel was well prepared for trial. I think that counsel, based upon what he had on the police reports, the preliminary hearing transcript, and the fact that the victim died before the trial, he was going to, if you look at his closing argument, he based his argument upon that there was a misidentification by Rabotin, that the timeline given by some of the witnesses, those were off, and that there were other people in the area that might have been involved in this, but it wasn't his client. Now, the decision to do that was reasonable based upon the information that he had. Even at the state post-conviction hearing, when he was asked, well, if you knew about the testimony from the bartenders in advance, would that have changed your strategy at all? And he said no, it would not have changed his strategy. So you've got a case where he's, and he hasn't been provided any alibi information whatsoever by his client. So there's no one to, as the courts pointed out, that there's no one to question in that respect. So if he's got no one to question about the alibi possibility, in other words, I'm not there, because his defense is, well, I'm there, but all I'm doing is dealing drugs. I'm not trying to rob anybody or shoot anyone. Well, then what the closing argument, I think, shows is that he did have a plan. It may not, 12 years after the fact, it may not look in 20-20 hindsight to be perfect, but a person is not entitled to a perfect defense. The reasonableness of those actions should be gauged by the particular facts of this case. And the specific grounds here, there's two aspects of it. One was in regards to his failure to contact any witnesses. The other is the failure to hire an investigator. Now, one of the things that we look at is what information would have been obtained and would it have changed the result, which leads into the prejudice prong. The Nevada Supreme Court thought that this was a case with overwhelming evidence, not a weak case. If you look at the facts in this case, you have a situation where the petitioner and his co-defendant were caught not hours after the event, not minutes, but seconds. It was their bad luck that when the shots were fired into the victim that there was an off-duty Las Vegas police officer in the vicinity finishing his dinner. He hears two shots. He goes towards the sound of the shots. And who does he see coming out? Petitioner and his co-defendant. And he's able to arrest them within just mere moments of the action taking place. Before that, there are witnesses that identified them in the area. And the state's theory is that Mr. Rabat may have been an unintended victim, that actually they were thinking of going for the coin provider for the video poker machines in the lounge where this took place. The... Once again... Who else testified that saw the incident? You've got the two bartenders, there's Contreras... And they, because they saw these men inside the bar first? They testified... Because the incident took place outside the bar, right? The shooting took place outside the bar, that's correct, Your Honor. Okay. But the bartenders placed the two men inside the bar before that. However, other people see the defendant... We have the 14-year-old girl, we have the trash man. And Contreras. And then, of course, you've got the victim himself, who was not able to testify at trial. He died on the drive back. Okay, but he misidentified in a photo lineup or something? Photo lineup, but he did identify them at the preliminary hearing. So there are two inside witnesses and two outside witnesses, right? Or maybe more than that. The two bartenders, they just... There was also evidence, Dominguez, who was the co-defendant, when he was being arrested or when he was being pursued by the first officer on the scene, he went to hide behind a dumpster, and underneath that dumpster was found the gun that was linked to the shooting. So there's some physical evidence there. There were some inconsistent statements between the petitioner and his co-defendant regarding, well, geez, I don't know him or what they were doing in the area. There were fingerprints related to these two individuals on a rent-a-car that was in the area. So I believe that the Nevada Supreme Court's characterization of the evidence is actually overwhelming because, once again, they were arrested seconds after this happened. Mr. Ambrose says that the prosecutor felt the case was real weak right before they went to trial. Is there anything about that? I would care not to speculate as to the prosecutor's feelings about their case. Nevada Supreme Court felt that there was overwhelming evidence, and I don't think that that finding is unreasonable, and I don't think that there is a United States Supreme Court case that the Nevada Supreme Court's decision is contrary to. I don't think your Supreme Court case clearly states that a defense attorney has to talk to every single witness. What if he doesn't talk to any witnesses? Once again, it's very fact-dependent upon the information that's provided to the attorney, and it's not so much talking to every single witness. It's, did they do a reasonable job? Did they conduct some kind of investigation? In this case, they did. Does the Court have any further questions? If not, we would ask the Court to uphold the lower court's opinion and deny the writ of petition for writ of habeas corpus. Okay. Thank you, Mr. Warwick. Mr. Ambrose, what do you do about the off-duty police officer? Well, he didn't see it happen. He was in the parking lot. But he hears the shots fired, and he sees two guys taking off immediately. Right. Exactly. And, you know, he gets statements, but he doesn't get statements from both of the defendants that incriminate them in terms of, like, them having been the people that accosted and robbed Mr. Robotin. What about the gun found under the dumpster? Well, the gun was found under the dumpster. If you read the trial testimony, I think it was Richard Good, the criminalist, does not link the slug that eventually fell out of Mr. Robotin's back with that gun. There was never any definitive evidence that that was indeed the slug that came from that gun. The criminalist was equivocal on that point. And I think the district judge below pointed that out in the opinion, as did the Nevada Supreme Court. Was the gun distinctive? I can't remember if it was or not. I think it was just a .38, but I can't remember that. Did it match any description of the gun that Mr. Robotin had given? Mr. Robotin did not. I don't think he gave a description of the gun. As I recall, I don't think he remembered actually seeing a gun because it was so dark, but I may be wrong on that point. That was the only weapon found, and it was pretty close to where all this occurred. It was in the same parking lot, and it was the only weapon found. But, you know, I want to clarify one, I think, mistake or misstatement that may have been made, and I don't mean to suggest it was intentional. The record, my review of this record is that the only witness that actually, as Judge Bybee asked the question, how many witnesses, who were the witnesses that saw the incident? And by incident, I mean that that suggests that actually saw the two people accost and shoot Mr. Robotin. The only witness that saw that was Robotin himself. The bartenders did not see that. Ms. Katz did not see that, the 14-year-old girl. Mr. Contreras, the guy taking the trash out, didn't see it. The police officer didn't see it, nor did the coin man see it. So, you know, Robotin was the key, and it wasn't a photo lineup that Robotin failed to pick the defendants out of. It was a physical lineup. It was a lineup where there were actual people there, and Mr. Robotin failed to pick them out. And also, at the preliminary hearing, with both of the defendants sitting at counsel table, Mr. Robotin was candid enough to say, you know, I think what I'm remembering is the clothes and not the defendant. Of course, all of this could suggest you have the case, the State's case has quite a bit of circumstantial evidence around it. I mean, you can place the man inside the bar immediately before the shooting. We can place them running away from the scene immediately after the shooting. You can place Dominguez doing that, but not Parada. Parada surrendered immediately. But he's in the vicinity. Yeah, absolutely. I mean, he is in the area, and there doesn't appear to be anybody else in the area that looks to be running away or glancing furtively or hiding under a car or doing anything else. I mean, these are the guys who are sort of right there afterwards. So, I mean, there's strong circumstantial case. The fact that Mr. Robotin dies and that he has given some candid testimony to say, gosh, you know, I'd like to be able to say that's absolutely the guy, but I'm going to have to tell you in all candor, I think this is the guy, but I'm not 100 percent sure. I mean, that surely suggests a reason why the State might have been willing to compromise this claim on the eve of trial. Right. But all of this evidence did go to the jury, and there is some fairly strong circumstantial evidence here. Right. And there's no question about it, but it went to the jury in a way that was a violation of the Sixth Amendment. It should have gone to the jury with a lot more poking and prodding at the old reasonable doubt concept, and that's why I'm hoping that this Court will find prejudice. And I do appreciate the fact that I was allowed to go over a minute. Okay. Thank you. Thank you, Mr. Lambros. Thank you, Mr. Warwick. Thank both counsel.
judges: Noonan, Siler, Bybee